NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0225n.06

No. 21-5937

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT** | | **FILED**<br>Jun 06, 2022<br>DEBORAH S. HUNT, Clerk |
| JOSEPH JARVIS, | ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| HINES FURLONG LINE, INC., | ) ) | |
| Defendant-Appellee. | ) ) ) | OPINION |

Before: STRANCH, DONALD, and THAPAR, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Joseph Jarvis suffered a back injury while working on an inland tug boat, the M/V Warren Hines, a vessel that was being repaired at a shipyard in Paducah, Kentucky. Alleging that he held the status of seaman, Jarvis brought a personal injury suit under the Jones Act and general maritime law. The district court granted summary judgment to Jarvis's employer, Hines Furlong Line, Inc. Because the Warren Hines was not in navigation and, therefore, Jarvis was not a seaman under the Jones Act, we **AFFIRM**.

## I. BACKGROUND

Hines Furlong owns the vessel M/V Warren Hines, which is "an inland tug boat" that was built in 1983. The vessel was at the National Maintenance shipyard in Paducah, Kentucky, "for complete refurbishment" from September 2017 to June 2019. It is undisputed that the Warren Hines "underwent many repairs" during its time at the shipyard. Hines sent "a couple" of workers like Jarvis to the shipyard to work on the vessel to do things such as "demolition work," "painting," "helping with plumbing," "pulling wires," and "chipping." Jarvis served as a deckhand on working

tugboats but moved to work on the Warren Hines repairs in April 2018 after his doctor diagnosed him with a nonoccupational illness and placed him on light duty.[1]

Danny Whitford, Hines Furlong's Vice President of Operations, is "heavily involved" in the maintenance side of the company and primarily works "in new construction and refurb[ishments]." Smith Freeman is a Hines employee. Both are familiar with the refurbishment of the Warren Hines tug boat. The vessel had "extensive hull work" done because, as Jarvis explained, "a lot of the hull had to be replaced." The refurbishment included completely removing and replacing the interior with "all new finish work, a lot of electrical work, [and] plumbing." The fuel tanks also were "cleaned and emptied," so "the boat did not have any fuel, lube oil, [or] anything of that nature on it." The repairs also included "bow work," a "[n]ew cooling system for the engines, [and] some hull plating that . . . needed to be replaced."[2] There were also repairs to "a hole in the starboard fore compartment."

During the repairs, there were unexpected delays. For example, some unanticipated hull work delayed the repairs by at least three months. In another instance, a "bent shaft in a gearbox" caused a four week delay.

During its time at National Maintenance, the Warren Hines did not leave the shipyard, but it was on dry dock on two occasions. The first time the vessel was on dry dock was to remove "all the drive gear, propellers, shafts, [and] rudders . . . so that it could be in a repair process." Then, the vessel was in water for "[s]everal months" before it was on dry dock a second time to "put everything back in it that had been removed." Ultimately, the repairs were extensive enough that

---

[1] Jarvis was released for full duty in "May or June of 2018."

[2] The water pumps, which were replaced, "distribut[e] water and coolant through the main engines." There are two engines on the vessel and there are two water pumps per engine. A port engineer did some work on the engines and Jarvis assisted with the main engines, which included "getting sand and grit from all the sand blasting out of the main engines and doing a flush of the main engines and maintenance [, and] putting filters on."

the vessel "wasn't even capable of floating in the water" when it was on dry dock, where it was "for the most part" during the repair process. When the vessel needed to be moved around the shipyard, it had to be pulled by a harbor tug.

When Jarvis was injured on the Warren Hines in April 2019, the repairs were mostly done, and Hines Furlong was trying to get the vessel out in June.

Jarvis brought a statutory claim, alleging negligence under the Jones Act, a statute that covers personal injury claims for "seaman injured in the course of employment," 46 U.S.C. § 30104. He also sued under the general maritime law,[3] claiming that the vessel was unseaworthy and that he is entitled to maintenance and cure benefits.[4] Finding that Jarvis was not a seaman under the Jones Act, the district court granted summary judgment in favor of Hines Furlong.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 507 (6th Cir. 2021). Summary judgment is proper when the record, viewed in the light most favorable to the nonmoving party, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[3] "[U]nder 'the general maritime law ... a vessel and her owner ... were liable to an indemnity for injuries received by a seaman in consequence of the unseaworthiness of the ship and her appliances." *The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2281 (2019) (quoting *Pacific S. S. Co. v. Peterson*, 278 U.S. 130, 134 (1928)).

[4] "'Maintenance and cure' is the right of 'the seaman, ill or injured in the service of the ship without willful misbehavior on his part[ to] wages to the end of the voyage and subsistence, lodging, and medical care to the point where the maximum cure attainable has been reached.'" *The Dutra Grp.*, 139 S. Ct. at 2288 n.2 (Ginsburg, J. dissenting) (alteration in original) (quoting 2 R. Force & M. Norris, The Law of Seaman § 26:1, p. 26–4 (5th ed. 2003)); *Arnold*, 196 F. App'x at 334 (describing maintenance and cure as "the right to be cared for and paid wages during the voyage.").

### III.    DISCUSSION

The Jones Act provides a statutory negligence cause of action. *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 415 (2009). Under the Act, a "seaman injured in the course of employment" may bring a suit against the employer. 46 U.S.C. § 30104. The statute does not define who qualifies as a "seaman" under the Act. *Arnold v. Luedtke Eng'g Co.*, 196 F. App'x 331, 334 (6th Cir. 2006).

To assess whether Jarvis is a seaman under the Jones Act, the Supreme Court has established a two-part test. First, "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'" *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995) (alteration in original) (quoting *McDermott Intern., Inc. v. Wilander*, 498 U.S. 337, 355 (1991)). Second, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.*

Jarvis presents reasoned arguments regarding his duties as an employee, but his case is appropriately resolved on whether the Warren Hines meets the requirement of being "a vessel in navigation." Jarvis argues that the Warren Hines was in navigation because it was in the water at points during its repair. Hines responds that the repairs were so extensive that the Warren Hines did not meet the requirement of being in navigation. Whether a vessel is in navigation is a "fact-intensive" inquiry that is normally resolved by a jury, not the court. *Id.* at 373. But when the law and facts "reasonably support only one conclusion" the court can decide the issue. *Id.*

When determining whether a vessel is in navigation, we consider "whether the craft is 'used, or capable of being used' for maritime transportation" and ask if its use "is a practical possibility or merely a theoretical one." *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 496 (2005) (unattributed internal quotation marks in original) (defining the term "in navigation" under the

Longshore and Harbor Workers' Compensation Act); *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955, 958 (5th Cir. 1971) (defining the term "in navigation" under the Jones Act as "engaged in an instrument of commerce and transportation on navigable waters.").

If a vessel is under repair, the extent of the repairs bears on whether the vessel is capable of being used for transportation. Generally, if a vessel is "at anchor, berthed, or at dockside" and is undergoing repairs and not voyaging, it does not stop being in navigation. *Chandris*, 515 U.S. at 373–74, (quoting *DiGiovanni v. Traylor Bros., Inc.,* 959 F.2d 1119, 1121 (1st Cir 1992) (en banc)). But "[a]t some point . . . repairs become sufficiently significant that the vessel can no longer be considered in navigation." *Id.* at 374. Thus, vessels undergoing minor repairs can be in navigation, while vessels undergoing major overhauls or renovations can be taken out of navigation. *Id.*

We focus on "the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done" to determine how significant the repairs are. *Id.* (quoting *West v. United States*, 361 U.S. 118, 122 (1959)); *Wixom v. Boland Marine & Mfg. Co.*, 614 F.2d 956, 957 (5th Cir. 1980) (explaining that "the court should look at the extent and nature of the repair operations and who controls them."); *see Stewart v. Magnum Transcon. Corp.*, 81 F. Supp. 2d 753, 756 (S.D. Tex. 2000) ("[T]he Court looks to the time and cost required for the repair work, as well as whether the ship's power is secured or dismantled and whether the ship's crew is dismissed.").

The question that remains is what qualifies as a major renovation. Our sister circuits have addressed that issue. In *McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567 (9th Cir. 1992), the defendant spent 17 months and over 14 million dollars converting an oil ship to a seafood processing ship. *Id.* at 568. The renovations included, for example, stripping off everything above the main deck; enclosing a large hole through the hull and decks; adding a deck, crew spaces, and

equipment; pouring a concrete floor; installing elevators; and general cleaning and painting. *Id.* at 570–71. The court held that the vessel was not in navigation because it "was undergoing a major conversion process, which included its move to Tacoma, Washington for completion." *Id.* at 572.

The Fifth Circuit in *Wixom* similarly held that a vessel was not in navigation where the repairs on the ship took nearly three years and exceeded 25 million dollars. 614 F.2d at 957. The court considered several factors: the "ship's captain and crew were not aboard the vessel, . . . responsibility for the ship was vested entirely in [the defendant]," "[t]he work performed on the vessel included major structural changes such as the addition of a section to the deckhouse and of a forward mast," and at a certain point the "engine and propellers were inoperable." *Id.*

Like the vessels in *McKinley* and *Wixom*, the Warren Hines was at the shipyard for well over a year—in fact, almost two years. And like the vessel in *Wixom*, the Warren Hines crew was not aboard the vessel (with the exception of the engineers who were needed for the repairs).

The record reveals that the Warren Hines was undergoing repairs comparable to those in *McKinley* and *Wixom*: there was "extensive hull work" such that "a lot of the hull had to be replaced"; the old interior was removed and replaced with a new interior that had "all new finish work, a lot of electrical work, [and] plumbing"; the fuel tanks were "cleaned and emptied"; the water pumps were replaced; work on the main engines included a "[n]ew cooling system for the engines"; and there was bow work done. Workers sent to the vessel, like Jarvis, did things such as "demolition work," "painting," "helping with plumbing," "pulling wires," and "chipping." The vessel spent most of its time on dry dock during the repair process, and it "wasn't even capable of floating in the water" during that time.

Jarvis does not dispute that these repairs occurred or that the hull work was "extensive"; instead, he claims that there is an issue of material fact because the Warren Hines was placed into

the water after each time it was on dry dock and was moved to various locations in the shipyard while in the water. But he does not provide case support for his argument that a vessel that is in water for "[s]everal months" in between being placed on dry dock and that required a tug to be moved because it lacked operational engines qualifies as a vessel in navigation. The fact that the vessel was placed in water on occasions during its repair is insufficient to show that it was "'used, or capable of being used' for maritime transportation." *Stewart*, 543 U.S. at 496 (unattributed internal quotation marks in original). The full facts of the case must be reviewed. Here, the length of time it took to make the repairs, *see Magnum Transcon. Corp.*, 81 F. Supp. 2d at 756, the fact that the crew was not aboard the vessel, *see Wixom*, 614 F.2d at 957, "the pattern of the repairs, and the extensive nature of the work . . . done," *see Chandris*, 515 U.S. at 374 (quoting *West*, 361 U.S. at 122), taken together lead to the conclusion that the Warren Hines vessel was not in navigation.

## IV.   CONCLUSION

Because the Warren Hines was not in navigation, Jarvis is not entitled to seaman status as a matter of law. We **AFFIRM**.